**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                         )
ÖSSUR HF and ÖSSUR AMERICAS, INC.,      )
                                         )
    **Plaintiffs,**                      )
                                         )        **Civil Action No.**
         **v.**                          )        **12-11061-FDS**
                                         )
**iWALK, INC.,**                         )
                                         )
    **Defendant.**                       )
_____)


**MEMORANDUM AND ORDER ON**
**CLAIM CONSTRUCTION**

**SAYLOR, J.**

This is a patent dispute involving sophisticated prosthetic limbs—specifically, devices

that function as feet and ankles for patients whose legs have been amputated below the knee.

Plaintiffs Össur HF and Össur Americas, Inc., (collectively "Össur") design and manufacture

prostheses, including a microprocessor-controlled prosthetic foot/ankle system.  Össur seeks a

judgment that a prosthetic foot/ankle system manufactured and sold by defendant iWalk, Inc.,

infringes upon its patents.  iWalk has asserted, among other things, defenses of non-infringement

and invalidity of the patents.

The parties' allegations hinge in part on the construction of the claims in Össur's U.S.

Patent No. 7,431,737 (the "'737 patent") and U.S. Patent No. 7,896,927 (the "'927 patent").  The

Court conducted a _Markman_ hearing on the construction of the relevant claims on February 25,

2013.

Össur and iWalk dispute twelve terms:  (1) "gait pattern(s) or event(s)," (2) "ankle-angle

adjustments," (3) "processing module," (4) "substantially mimicking the movement of a healthy ankle," (5) "subsequent gait cycles," (6) "corresponding to [a/the] determined gait pattern or event," (7) "position," (8) "movement," (9) "state transition is detected from the determined gait pattern or event to a different gait pattern or event," (10) "relaxed position" (and related phrases), (11) "configurable element," and (12) "automatically adjusting."  iWalk also contends that three of the disputed terms are indefinite and therefore render the relevant claims invalid.

I.    **Background**

Össur is an Icelandic company that designs and sells products and technologies in the fields of prosthetics, orthotics, bracing and supports, and compression therapy.  The patents at issue here concern a microprocessor-controlled prosthetic foot/ankle system called the "Proprio Foot."

iWalk is a Massachusetts-based company that designs and sells prostheses.  The company was founded in 2006 by an MIT professor, Dr. Hugh Herr, who became a bilateral amputee after a 1982 climbing accident.  After designing his own prostheses for personal use, Dr. Herr founded iWalk to design and sell prostheses on the commercial market.  Since 2011, the company has sold a powered foot/ankle prosthesis, called the "PowerFoot BiOM," which is the subject of Össur's infringement contentions.

Össur filed the application that ultimately produced the '737 patent on February 11, 2005.  The '737 patent was issued on October 7, 2008.  Össur filed the application for the '927 patent on March 1, 2006.  The '927 patent was issued on March 1, 2011.  The '737 patent is directed to systems and methods for controlling a prosthetic foot/ankle system.  The '927 patent is a continuation of the '737 patent, claiming refinements to the invention.

On November 15, 2011, Össur filed this action, alleging that iWalk has infringed both the '927 and '737 patents. Specifically, Össur contends that iWalk has infringed on claims 1, 3, 6, 7, 21, 22, 33, and 34 of the '737 patent and claims 1, 2, 5, 7, and 11 of the '927 patent.

Claims 1, 3, 6, 7, 21, 22, 33, and 34 of the '737 patent read as follows:

1.      A method for controlling an ankle device associated with the movement of a limb, the method comprising:  monitoring, with at least one sensor, at least one of position and movement of an ankle device associated with a limb throughout at least one gait cycle, wherein the device comprises a foot unit, a lower limb member, and at least one actuator; generating data indicative of the at least [sic] one of position and movement throughout the at least [sic] one gait cycle; processing the data with a processing module to determine if the data corresponds to one of a plurality of defined gait patterns or events, wherein information defining said plurality of gait patterns or events is stored in a memory of the device; determining ankle-angle adjustments corresponding to a determined gait pattern or event; and adjusting the device based on the determined ankle-angle adjustments corresponding to the determined gait pattern or event, wherein the adjusting comprises actuating the at least [sic] one actuator to move the lower limb member relative to the foot unit in a manner substantially mimicking movement of a healthy ankle, said ankle-angle adjustments being applied over a swing phase of subsequent gait cycles until a state transition is detected from the determined gait pattern or event to a different gait pattern or event.

3.      The method of claim 1, wherein the device comprises a prosthetic device.

6.      The method of claim 1, wherein the at least [sic] one sensor is located on the device.

7.      The method of claim 1, wherein the actuating comprises at least one of the following:  extending and contracting the at least [sic] one actuator.

21.     The method of claim 1, wherein the device associated with a limb is a device attachable to a limb.

22.     The method of claim 1, wherein the plurality of defined gait patterns or events comprises at least one of the following:  stance, level ground walking, ascending stairs, descending stairs, incline, decline, sitting down, sitting, standing up, adjust heel height, off, heel height calibration, sensor calibration, neutral, relax, and pants.

33.     The method of claim 1, wherein a gait cycle comprises one full stride of a user.

3

34.     The method of claim 1, wherein the determined ankle-angle adjustments comprise at least one of the following:  toe clearance; user set point; set heel height; relax ankle; a desired degree of dorsiflexion; a desired degree of plantarfiexion; ten degrees of dorsiflexion; five degrees of dorsiflexion; seven and a half degrees of dorsiflexion; 20 degrees of plantarfiexion; an ankle angle associated with an incline angle threshold level; an ankle angle associated with a decline angle threshold level; an ankle angle associated with an incline angle of five degrees; an ankle angle with an incline angle of two and a half degrees; an ankle angle associated with a decline angle of five degrees; and an ankle angle associated with a decline angle of two and a half degrees.

Claims 1, 2, 5, 7, and 11 of the '927 patent read as follows:

1.      A method for adjusting a prosthetic ankle device, the method comprising: monitoring with at least one sensor the movement of a user of a prosthetic ankle device; generating data indicative of the movement; processing the data with a processing module to determine whether the user is in a relaxed position, wherein the relaxed position is a sitting position; and adjusting the prosthetic ankle device based on whether the user is in the relaxed position, wherein adjusting the prosthetic ankle device comprises automatically adjusting a configurable element of the prosthetic ankle device.

2.      The method of claim 1, wherein the at least [sic] one sensor is located on the prosthetic ankle device.

5.      The method of claim 1, wherein monitoring with the at least [sic] one sensor the movement of the user of the prosthetic ankle device comprises monitoring an acceleration of the prosthetic ankle device.

7.      The method of claim 1, wherein monitoring with the at least [sic] one sensor the movement of the user of the prosthetic ankle device comprises monitoring a length of time that the user of the prosthetic ankle device exhibits a movement characteristic indicative of the relaxed position of the user.

11.     The method of claim 1, wherein the configurable element is the amount of operating power.

These claims describe methods that allow a prosthetic foot/ankle system to mimic the movement and function of a healthy human ankle.  A human foot and ankle go through a series of motions and provide support in different ways during the course of daily activities.  Particularly important to the patents at issue are the movements during normal walking, or

4

"gait," and the functions of those movements.  When describing such movements, those skilled

in the art, often refer to a period known as a "gait cycle."  A "gait cycle" is a full stride spanning

from one heel-strike to the next heel-strike of the same foot.  Within a gait cycle, there are two

general phases:  the stance phase (the period of time when the foot is touching the ground) and

the swing phase (the period of time when the foot is off the ground).  Within these phases the

foot engages in, and is in positions of, both "plantarflexion" and "dorsiflexion."  "Dorsiflexion"

describes the action of decreasing the angle between the ankle and the foot, and also refers to the

position of the foot where the angle between the ankle and the foot is less than 90 degrees.

"Plantarflexion" describes the action of increasing the angle between the ankle and the foot, and

also refers to the position of the foot where the angle between the ankle and the foot is greater

than 90 degrees.

The prosthesis used to practice the claimed methods must have a foot unit and a "lower

limb member" (in other words, an ankle unit) that pivot relative to one another.  The prostheses

must also be able to control the angle between the foot unit and the lower limb member (the

"ankle-angle").  Claim 1 of the '737 patent describes a method for achieving appropriate

ankle-angle adjustments during the swing phase so that the device "substantially mimic[s]

movement of a healthy ankle."  The claimed method teaches monitoring data, throughout a

wearer's gait cycle, about the position or movement of the device, and then comparing that data

to pre-stored data corresponding to states of activity (referred to as "gait patterns or

events")—for example, walking up an incline or descending stairs—to determine the wearer's

current gait pattern.  The claimed method involves adjusting the ankle-angle during subsequent

swing phases based on this data.  Claim 1 of the '927 patent similarly describes a method for

5

achieving appropriate ankle-angle adjustments when the wearer is in a "relaxed position."

Össur's Proprio Foot is the apparatus designed to practice these methods, and is consequently the commercial embodiment of the claims at issue. The Proprio Foot is a microprocessor-controlled prosthetic foot/ankle system that uses data it collects to perform ankle-angle adjustments as described in the patents.

Össur contends that iWalk's BiOM, which is a powered foot-and-ankle prosthesis, also practices the methods of the patents at issue. The BiOM mimics the movement of a healthy ankle during stance phase by using a control system that emulates spinal-cord reflexes but does not utilize pre-programmed ankle positions. The BiOM also provides powered plantarflexion during the stance phase—in other words, the forefoot pushes off the ground before each walking step. During the swing phase, the BiOM returns the foot to a neutral position where it has a hard mechanical stop.

In response to Össur's infringement allegations, iWalk first contends that the asserted claims are invalid because three of the terms used in those claims are indefinite. Specifically, iWalk contends that the terms "gait pattern(s) or event(s)," "substantially mimicking the movement of a healthy ankle," and "configurable element" are indefinite. The parties also generally contest the interpretation of twelve separate terms used to describe the methods in the claims recited above. The terms in dispute are: (1) "gait pattern(s) or event(s)," (2) "ankle-angle adjustments," (3) "processing module," (4) "substantially mimicking the movement of a healthy ankle," (5) "subsequent gait cycles," (6) "corresponding to [a/the] determined gait pattern or event," (7) "position," (8) "movement," (9) "state transition is detected from the determined gait pattern or event to a different gait pattern or event," (10) "relaxed position" (and related

phrases), (11) "configurable element," and (12) "automatically adjusting."

## II.    <u>Legal Framework</u>

The construction of claim terms is a question of law.  *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give the patent its meaning.  The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  *Id.* at 1313.  Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

A.     <u>The Words of the Claims Themselves</u>

The claim construction analysis normally begins with the claims themselves.[1]  The claims of a patent "define the invention to which the patentee is entitled the right to exclude."  *Id.* at 1312 (citing *Innova*, 381 F.3d at 1115).

As a preliminary matter, it is well-established that a court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.  . . .[When] the 'ordinary' meaning of a term does not resolve the parties' dispute . . . claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit."); *Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206-07 (Fed. Cir. 2010); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

---

[1] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

*Id.* at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

In some instances, it is the arrangement of the disputed term in the claims that is dispositive.  "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term."  *Phillips*, 415 F.3d at 1314.  For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another.  *Id.*  In addition, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Id.* at 1315.

### B.    The Specification

 "The claims, of course, do not stand alone."  *Id.* at 1315.  Rather, "they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims."  *Id.* (internal citations and quotations omitted).  For that reason, the specification must always be consulted to determine a claim's intended meaning.  "[T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention."  *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315-1317 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim").  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess."  *Phillips*, 415 F.3d at 1316.  It may also reveal "an intentional disclaimer, or disavowal,

of claim scope by the inventor." *Id.* Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification. *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part.").

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323; *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005) (internal quotations omitted). A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect."). "In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323. This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will

be, in the end, the correct construction." *Id.* at 1316 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

### C.  The Prosecution History

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning.  The prosecution history consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. *Id.* at 1317.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.*  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (citing *Vitronics*, 90 F.3d at 1582-83).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*  As a result, courts generally require that "a patent applicant [] clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378 (Fed. Cir. 2005)).

### D.  Extrinsic Sources

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317.  It "can help educate the court regarding the field of the invention and can help

the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319.  However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance.  *Id.* at 1318-19.  Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion.  *Id.* at 1319.

      **E.**     **Indefiniteness**

Section 112 of the Patent Act provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112, ¶ 2.  It follows that, as a condition of validity, each patent claim must be sufficiently definite that "one skilled in the art would understand the bounds of the claim when read in light of the specification."  *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  A claim is not indefinite as long as its meaning is "discernible, even though the task [of claim construction] may be formidable and the conclusion may be one over which reasonable persons will disagree."  *Id.* at 1375.  Rather, a claim is invalid for indefiniteness only if it is "insolubly ambiguous, and no narrowing construction can properly be adopted."  *Id.* at 1378.

Claim indefiniteness is an issue of law to be decided by the court.  *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331 (Fed. Cir. 2010).  While "a court may consider or reject certain extrinsic evidence in resolving disputes en route to pronouncing the meaning of claim language, the court is not crediting certain evidence over other evidence or making factual evidentiary findings.  Rather, the court is looking to the extrinsic evidence to assist in its

construction of the written document." *Exxon Research*, 265 F.3d at 1376 (internal quotations

omitted).  Because indefiniteness renders a claim invalid, it must be proved by clear and

convincing evidence to overcome the presumption of validity.  *Halliburton Energy Servs., Inc. v.*

*M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008); *see also Exxon Research*, 265 F.3d at 1380

("[C]lose questions of indefiniteness . . . are properly resolved in favor of the patentee.").

**III.**   **Analysis**

The proposed constructions of the disputed terms in the '737 and '927 patents are as

follows:

| CLAIM TERM | ÖSSUR'S PROPOSED CONSTRUCTION | iWalk'S PROPOSED CONSTRUCTION |
| --- | --- | --- |
| "gait pattern(s) or event(s)" | "detectable series of natural ankle movements during locomotion or normal ankle functions during nonlocomotion" | indefinite |
| "ankle-angle adjustments" | "ankle motion strategy for changing the angle between the foot unit and the lower limb member" | "at least two changes to the angle between the foot unit and the lower limb member" |
| "processing module" | "computer-like component of the ankle device" | "hardware logic, firmware logic, or software instructions" |
| "substantially mimicking the movement of a healthy ankle" | no construction necessary, ordinary meaning | indefinite |

13

| | | |
|---|---|---|
| "subsequent gait cycles" | no construction necessary, ordinary meaning; or "later gait cycles" | "gait cycles after the at least [sic] one gait cycle" |
| "corresponding to [a / the] determined gait pattern or event" | no construction necessary, ordinary meaning | "corresponding to the gait pattern or event determination made with the data" |
| "position" | no construction necessary, ordinary meaning | "location relative to ground" |
| "movement" | no construction necessary, ordinary meaning | "change of position in time" |
| "state transition is detected from the determined gait pattern or event to a different gait pattern or event" | "change from a first defined gait pattern or event to a second defined gait pattern or event" | "change is detected from one determined gait pattern or event to another determined gait pattern or event" |
| "relaxed position" | no construction necessary, ordinary meaning; or "non-walking posture (such as sitting, crossing legs, reclining, lying down, crawling, leaning, etc.)" | "sitting position" |
| "configurable element" | "parameter" | indefinite |
| "automatically adjusting" | no construction necessary, ordinary meaning | "changing from one state to another state based on the processed data" |

A.  <u>**"Gait Pattern(s) or Event(s)"**</u>

The term "gait pattern(s) or event(s)" appears in claims 1 and 22 of the '737 patent.  Its

use in the following passage from claim 1 is typical:

> processing the data with a processing module to determine if the data corresponds to one of a plurality of defined **gait patterns or events**, wherein information defining said plurality of **gait patterns or events** is stored in a memory of the device; determining ankle-angle adjustments corresponding to a determined **gait pattern or event** . . .

'737 Patent at col. 20 ll. 41-47 (emphasis added).

1.     **Indefiniteness**

Rather than propose a construction for the term "gait pattern(s) or event(s)," iWalk contends that the term is indefinite, and that it therefore renders claims 1 and 22 of the '737 patent invalid.  As set forth above, in order to be valid, a patent claim must be sufficiently definite that "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon Research*, 265 F.3d at 1375.  Because all patents are presumed valid, and a finding of indefiniteness renders a claim invalid, indefiniteness must be proved by clear and convincing evidence.  *Halliburton*, 514 F.3d at 1249.

There is an ambiguity that must be resolved at the outset that the parties have not directly addressed, although their briefing reflects the issue:  whether the word "gait" modifies both "patterns" and "events."[2]  That ambiguity, however, can be readily resolved by looking to the patent as a whole, including the specification, which is the approach endorsed by the Federal Circuit.  *See Scholle Corp. v. Packaging Sys.,* 2001 U.S. App. LEXIS 11772, 12-13 (Fed. Cir. 2001) (looking to the specification to determine whether the term "substantially" modified both "removed and excluded" or just one); *Lemelson v. Champion Spark Plug Co.*, 1992 U.S. App. LEXIS 17184 (Fed. Cir. 1992) (taking the same approach).  In context, the word "gait" clearly is intended to modify only the word "patterns."  Although there could be such a thing as a "gait event" (for example, a change in the angle of the foot), in context "events" are clearly intended to be functions that occur when a person is not walking, such as "sitting," "standing up," or "neutral."

---

[2] This type of ambiguity is sometimes referred to as the "Green Eggs and Ham" problem, after the children's book by Dr. Seuss.  In the book, it is unclear from the text whether eggs and ham are both green, or the eggs alone; the illustrations make clear, however, that both are green.

As to the parties' formal arguments on indefiniteness, iWalk contends that the term "gait pattern(s) or event(s)" is indefinite because it cannot be construed in such a way that it encompasses all of the "gait patterns or events" disclosed in the specification to the '737 patent. iWalk points to examples of "gait patterns or events" disclosed in the specification that do not fit within either category of Össur's proposed claim construction. According to iWalk, examples such as "adjust heel height," "off," "heel height calibration," "sensor calibration," "neutral," "relax," and "pants," are neither "natural ankle movements during locomotion" nor "normal ankle functions during nonlocomotion." iWalk contends that there is, in fact, no possible way to define the term so that it encompasses all of the examples disclosed in the specification, and the term is therefore indefinite.

iWalk's argument is flawed for a number of reasons. First, iWalk's focus on Össur's proposed construction is misguided. The focus of the inquiry is on the claim term itself, not either party's proposed construction of it. iWalk must prove that the claim term is "irreconcilable" with the specification, not that Össur's proposed construction is inconsistent with disclosed examples. *See Skyhook Wireless, Inc. v. Google, Inc.*, 2012 WL 4076180, *12 (D. Mass. 2012). Furthermore, the fact that Össur's proposed construction may not encompass all the disclosed examples, even if proved, is not clear and convincing evidence that no construction of the term whatsoever could encompass them. Finally, attorney argument, without more, is generally not considered clear and convincing evidence sufficient to overcome the presumption of validity. *See, e.g., WesternGeco LLC v. ION Geophysical Corp.*, 876 F. Supp. 2d 857, 875 (S.D. Tex. 2012) ("Defendants' unsupported attorney argument fails to prove indefiniteness by clear and convincing evidence."); *Cacace v. Meyer Mktg. Co.*, 812 F. Supp. 2d

547, 559-60 (S.D.N.Y. 2011) (ruling that claim term is not indefinite and explaining that "mere attorney argument is insufficient to establish invalidity based on indefiniteness").

The Federal Circuit has held that a claim term is indefinite where "a person of ordinary skill in the art could not determine [its] bounds." *Halliburton*, 514 F.3d at 1249.  In response to iWalk's indefiniteness contentions, Össur offered the declaration of its expert, Dr. Steven A. Gard.  Dr. Gard also testified at the *Markman* hearing before this Court.  In both his written statement and live testimony, Dr. Gard offered the opinion that "a person of ordinary skill in the art would have understood that the detectable 'gait patterns or events' are the series of natural ankle movements during locomotion, or the normal ankle functions during non-locomotion." (*See* Gard Dec. at ¶ 20).  iWalk, the party with the burden of proving indefiniteness, offered no competing expert testimony as evidence of indefiniteness.  Instead, it relied on the arguments recited above and on their cross-examination of Dr. Gard.

Although (as explained in further detail below) the Court is not entirely convinced that Össur's proposed construction is correct, iWalk has not met its burden of proving that the term "gait pattern(s) or event(s)" is indefinite.  Indeed, the record evidence suggests that a person of ordinary skill in the art would, in fact, be able to understand the term.  Accordingly, the Court finds that the term "gait pattern(s) or event(s)" is not indefinite.

## 2. **Claim Construction**

Össur proposes to define the term "gait pattern(s) or event(s)" as "detectable series of natural ankle movements during locomotion or normal ankle functions during nonlocomotion." Because iWalk contends that the term is indefinite, it proposes no alternative construction.

As support for its construction, Össur cites claim 22 and the specification of the '737

17

patent.  Specifically, Össur contends that claim 22 lists examples of "gait patterns" and "events."

According to Össur, the examples that describe types of locomotion are "gait patterns," and the

examples that describe normal ankle functions that occur while the device is not moving (in

other words, during nonlocomotion) are "events."  The list of claim 22 comprises the following:

"stance, level ground walking, ascending stairs, descending stairs, incline, decline, sitting down,

sitting, standing up, adjust heel height, off, heel height calibration, sensor calibration, neutral,

relax, and pants."  '737 Patent at col. 22 ll. 3-8.  Össur also contends that in the specification of

the '737 patent Figure 10, Table 1, and Table 2 provide examples of "gait patterns" and

"events."  Those figures and tables include the same examples as claim 22 with corresponding

ankle-angles and ankle-motion descriptors.

According to Össur, "level ground walking," "ascending stairs," "descending stairs,"

"incline," and "decline" are "gait patterns," or, in the words of the proposed construction,

"natural ankle movements during locomotion."  It contends that "stance," "sitting," "standing

up," "adjust heel height," "off," "heel height calibration," "sensor calibration," "neutral,"

"relax," and "pants" are "events," or, in the words of the proposed construction, "normal ankle

functions during nonlocomotion."

iWalk contends that the examples cited by Össur do not fit into the categories created by

its own proposed definition.  In its briefing, and at oral argument, iWalk made much of the fact

that examples like "off," "heel height calibration," and "adjust heel height" are not functions of a

normal human ankle.  However, Össur's proposed construction does not require that these

"events" be normal for a biological human ankle.  These examples can fairly be said to fit in the

proposed category of "normal ankle functions" for a mechanical prosthetic ankle.  To the extent

that some of the examples of "gait patterns" are not "natural ankle movements," that flaw can be easily remedied by replacing the descriptor "natural" with the word "normal" in reference to the "ankle movements" as well.

iWalk also cites to the prosecution history, specifically Össur's communications with the patent office and amendments to claim 23, which formerly described only "gait patterns." iWalk contends that because the amendment to claim 23 that included the addition of the word "events" was accompanied by the addition of only one new example— "relax"—the other examples must all be classified as "gait patterns." iWalk's heavy reliance on that evidence is misplaced. As described above, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1323. The Court is not convinced that Össur's amendment to claim 23 during the patent prosecution is an appropriate indicator of the meaning of the term "gait pattern(s) or event(s)" as it was ultimately used in the patent.

Accordingly, the Court will construe the term "gait pattern(s) or event(s)" to mean "detectable series of normal ankle movements during locomotion or normal ankle functions during nonlocomotion."

### B.    **"Ankle-Angle Adjustments"**

The term "ankle-angle adjustments" appears in claims 1 and 34 of the '737 patent. Its use in the following passage from claim 1 is typical:

> . . . adjusting the device based on the determined **ankle-angle adjustments** corresponding to the determined gait pattern or event, wherein the adjusting comprises actuating the at least [sic] one actuator to move the lower limb member relative to the foot unit in a manner substantially mimicking movement of a healthy ankle, said

> **ankle-angle adjustments** being applied over a swing phase of subsequent gait cycles until a state transition is detected from the determined gait pattern or event to a different gait pattern or event.

'737 Patent at col. 20 ll. 48-57 (emphasis added).

iWalk does not contend that this term is indefinite, and the parties generally agree that "ankle-angle adjustments" involve changing the angle between the foot and the lower limb member.  The parties disagree as to whether the fact that the word "adjustments" is plural requires there to be at least two changes to the ankle-angle.  iWalk contends that the plural necessarily indicates at least two changes to the ankle-angle.  Össur contends that because many of the examples of "ankle-angle adjustments" disclosed in claim 34 involve only one change to the ankle-angle, the term must not be construed to require two or more changes and thereby exclude those claimed examples.

Looking first to the language of the claims themselves, a number of examples of "ankle-angle adjustments" are provided in claim 34.  That claim describes certain "ankle-angle adjustments" as follows:

> . . . ankle-angle adjustments comprise at least one of the following:  toe clearance; user set point; set heel height; relax ankle; a desired degree of dorsiflexion; a desired degree of plantarflexion; ten degrees of dorsiflexion; five degrees of dorsiflexion; seven and a half degrees of dorsiflexion; 20 degrees of plantarflexion; an ankle angle associated with an incline angle threshold level; an ankle angle associated with a decline angle threshold level; an ankle angle associated with an incline angle of five degrees; an ankle angle with an incline angle of two and a half degrees; an ankle angle associated with a decline angle of five degrees; and an ankle angle associated with a decline angle of two and a half degrees.

'737 Patent at col. 23 ll. 5-17.  Össur contends that of those sixteen examples of "ankle-angle adjustments," none involve more than one change to the angle between the foot and the lower limb member.  Figure 10 and Table 2 of the specification of the '737 patent recite the same

examples of "ankle-angle adjustments" and indicate the precise single adjustment required for each of them.  This is strong evidence indicating that the term, as it is used in the claims, does not require two or more changes to the ankle-angle.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that "an interpretation [that excludes a preferred embodiment from the scope of the claims] is rarely, if ever, correct and would require highly persuasive evidentiary support").

iWalk emphasizes that in common usage a plural indicates more than one, and if Össur wanted to refer to a singular ankle-angle adjustment, it could have easily done so by omitting the letter "s."  Össur responds by suggesting that if it wanted to emphasize that "ankle-angle adjustments" involved at least two changes, it would have described them as a "plurality of" adjustments, rather than just using the plural.  It is certainly the case that in common English usage, a plural form of a noun indicates more than one, and it is not typical to precede the modified noun with the phrase "plurality of" to convey that meaning.  *Accord Dayco Prods. v. Total Containment, Inc.*, 258 F.3d 1317, 1328 (Fed. Cir. 2001) (indicating that the claim term "recesses" can be "understood to mean a single recess" and explaining that "if the patentees had wanted to require an insert means with more than one recess, it would have been natural to limit the claimed invention to an insert means with a 'plurality of recesses'").  However, as noted, the Federal Circuit in *Phillips* strongly cautioned against the approach of importing common usage definitions into claim construction.  415 F.3d at 1321.  Relying on such definitions is warranted only if no special meaning is apparent after reviewing the intrinsic evidence.  *Id.* at 1314.  The intrinsic evidence here, as recited above, indicates that the term "ankle-angle adjustments" includes actions that involve only a single change to the angle between the foot and the lower

limb member.  Accordingly, the Court will construe it as such.

Össur's proposed construction attempts to convey that the term describes actions that involve one or multiple changes to the ankle-angle by using the word "strategy."  Specifically, Össur urges that the term "ankle-angle adjustments" be construed as "ankle motion strategy for changing the angle between the foot unit and the lower limb member."  The Court finds this proposed construction unnecessarily confusing and not supported by the language of the claims. Instead, the Court will adopt a construction that is more appropriately centered on the agreement between the parties that "ankle-angle adjustments" involve the action of changing the angle between the foot and the lower limb member.

Accordingly, the Court will construe the term "ankle-angle adjustments" to mean "a change, or multiple changes, to the angle between the foot unit and the lower limb member."

### C.    "Processing Module"

The term "processing module" appears in claim 1of the '737 patent and claim 1 of the '927 patent.  The term is used in substantially the same way in both claims.  The relevant part of claim 1 of the '737 patent reads as follows:

> . . . processing the data with a **processing module** to determine if the data corresponds to one of a plurality of defined gait patterns or events, wherein information defining said plurality of gait patterns or events is stored in a memory of the device . . .

'737 Patent at col. 20 ll. 41-45 (emphasis added).

The parties generally agree that the "processing module" is responsible for comparing real-time data to stored memory.  The dispute concerning this term concerns whether it covers the entire central processing unit ("CPU") of the prosthetic device or only certain modules within the CPU.  iWalk contends that the term "processing module" describes one of three types of

modules—"hardware logic, firmware logic, or software instructions."  Össur contends that the term simply describes the CPU as a whole, and proposes to construe the term to mean a "computer-like component of the ankle device."

Össur's proposed construction finds greater support in the intrinsic evidence.  First, claim 1 of the '737 patent, when read in conjunction with the specification, seems to equate a "processing module" with a CPU.   As recited above, claim 1 indicates that the ankle device processes data with a "processing module to determine if the data [from at least one sensor] corresponds to one of a plurality of defined gait patterns or events." '737 Patent at col. 20 ll. 41-44.  The specification of the '737 patent explains that same series of events by stating that "the CPU processes information relating to the gait of the user, such as information received from the sensor module, [and] determines locomotion type (i.e., gait pattern)."   *Id.* at col. 13 ll. 61-64.

In addition, Figure 9 of the '737 patent specification suggests that the CPU is a processing module, which corresponds to, and works in conjunction with, the ankle unit's "sensor module," "interface module," "power module," and "control drive module."  *Id.* at fig. 9. The specification further states that physical memory, which can be stored internally or externally, is "access[ed] by another computing device or a computer processor."  *Id.* at col. 16 ll. 12-15.  The way that the terms "CPU," "computing device," and "computer processor" are used in the specification seem to suggest that they are synonymous with the "processing module."

On other hand, another part of the specification provides the basis for iWalk's proposed construction.  The specification indicates that the "CPU includes *modules* that comprise logic embodied in hardware or firmware, or that comprise a collection of software instructions written

in a programming language." *Id.* at col. 15 ll. 51-54 (emphasis added). Össur contends that confining the term "processing module" to these sub-components of the CPU inappropriately imports a limitation into the claim from a specific embodiment. According to Össur, the relevant characteristic is the existence of, and reliance on, the CPU itself, not the specific inner workings of the CPU.

Looking to the prosecution history to resolve the dispute, the PTO essentially adopted Össur's construction of the term. Specifically, the PTO cited to two prior art references that disclosed the use of a "microcomputer" and contended that those references anticipated claims that recited a "processing module," thus indicating that the PTO understood "processing module" to mean something like a microcomputer. (*See* Zovko Dec. at Exs. E, H, and I).

iWalk also contends that the use of the phrase "computer-like," as in Össur's prosed construction, would render the claim indefinite. This Court disagrees, but, in the abundance of caution, will add clarifying language in adopting Össur's proposed construction.

Accordingly, the Court will construe the term "processing module" to mean a "computer-like component, or CPU, of the ankle device."

### D.     **"Substantially Mimicking the Movement of a Healthy Ankle"**

The term "substantially mimicking the movement of a healthy ankle" appears in claim 1 of the '737 patent. The relevant part of the claim reads as follows:

> . . . adjusting the device based on the determined ankle-angle adjustments corresponding to the determined gait pattern or event, wherein the adjusting comprises actuating the at least [sic] one actuator to move the lower limb member relative to the foot unit in a manner **substantially mimicking movement of a healthy ankle** . . .

'737 Patent at col. 20 ll. 48-53 (emphasis added).

1. **Indefiniteness**

Rather than propose a construction for the term "substantially mimicking the movement of a healthy ankle," iWalk contends that the term is indefinite, and that it therefore renders claim 1 of the '737 patent invalid.  As outlined above, in order to be valid, a patent claim must be sufficiently definite that "one skilled in the art would understand the bounds of the claim when read in light of the specification."  *Exxon Research*, 265 F.3d at 1375.  Because all patents are presumed valid, and a finding of indefiniteness renders a claim invalid, indefiniteness must be proved by clear and convincing evidence.  *Halliburton*, 514 F.3d at 1249.

iWalk contends that the term "substantially mimicking the movement of a healthy ankle" is indefinite because the patent does not disclose information about the movement of a healthy ankle during all of the "gait patterns or events" described in the claims.  iWalk contends that, as a result, a person of ordinary skill in the art would not be able to evaluate whether a device "substantially mimics movement of a healthy ankle" during each and every action of the wearer.  iWalk further contends that the intrinsic evidence—specifically, claim 23 and Figure 8 of the specification of the '737 patent—describes the characteristic movements of a healthy ankle in contradictory fashion.  According to iWalk, claim 23 suggests that during the swing phase the foot moves first to a dorsiflexion position and then to a plantarflexion position, while Figure 8 depicts a swing phase wherein the foot does not ever enter a dorsiflexion position.  iWalk goes on to describe other instances where the patent claims and specification allegedly do not accurately, or adequately, describe the movement of a healthy ankle during certain actions.

iWalk contends that those alleged deficiencies in describing the movement of a healthy ankle, along with variations in gait patterns between individual persons, make it impossible for

one skilled in the art to judge whether or not a device "substantially mimics" a healthy ankle.

*See Halliburton*, 514 F.3d at 1255 ("when a proposed construction requires that an artisan make

a separate infringement determination for every set of circumstances in which the composition

may be used, and when such determinations are likely to result in differing outcomes (sometimes

infringing and sometimes not), that construction is likely to be indefinite").  iWalk further

contends that the use of the word "substantially" renders the claim indefinite because the patent

provides no guidance as to the degree of closeness required to meet this standard.  *See KLA-*

*Tencor Corp. v. Xitronix Corp.*, 2011 WL 318123, *3 (W.D. Tex. Jan. 31, 2011) (holding

"substantially maximizing" indefinite because "there is no standard for determining what is

substantially maximizing in the patent itself").

iWalk has again failed to meet its burden with regards to proving indefiniteness.  First,

iWalk's apparent insistence that the patent teach the characteristic movements of a healthy ankle

for each of the "gait patterns or events" is misguided.  A patent need not define every term or

reference contained in its claims in order to be definite; it need only provide sufficient

description so that "a person of ordinary skill in the art could [] determine [its] bounds."

*Halliburton*, 514 F.3d at 1249.  Accordingly, if a person of ordinary skill in the art understands

what the characteristic movements of a healthy ankle would be for the various actions disclosed

in the '737 patent, the patent need not define all of those characteristics.

Here, Össur's expert, Dr. Gard, offered the opinion, in both his written statement and live

testimony, that "[a] person of ordinary skill in the art . . . would have understood that the

movement of a healthy ankle during various types of gait patterns or events (e.g., walking,

ascending stairs, descending stairs, etc.) were well known and fully characterized in the field of

lower limb prosthetics." (*See* Gard Dec. at ¶ 30). iWalk, the party with the burden of proving indefiniteness, made reference in its briefing to the same text by Jacquelin Perry, M.D., relied on by Össur, but offered none of its own evidence or competing expert testimony as to indefiniteness.[3] Instead, it relied on attorney arguments and on its cross-examination of Dr. Gard in an attempt to persuade the Court that the Perry reference did not teach those skilled in the art what "substantially mimicking a healthy ankle" would require. Again, attorney argument, without more, is generally not considered clear and convincing evidence sufficient to overcome the presumption of validity. *See, e.g., WesternGeco LLC*, 876 F. Supp. 2d at 875; *Cacace*, 812 F. Supp. 2d at 559-60.

Furthermore, the patent's use of the modifier "substantially" does not render the term indefinite. The Federal Circuit very recently confirmed that the use of such modifiers do not render claims *per se* indefinite. *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) (remarking that "[t]his court has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim"). iWalk offered no affirmative evidence to establish that the use of the modifier here is confusing to those skilled in the art.

Although, as explained in further detail below, the Court is not entirely convinced that the term is so easily understood that it need not be construed, iWalk has not met its burden of proving that the term "substantially mimicking the movement of a healthy ankle" is indefinite. Indeed, the record evidence suggests that a person of ordinary skill in the art would, in fact, be able to understand the term. Accordingly, the Court finds that the term "substantially mimicking

---

[3] JACQUELIN PERRY, GAIT ANALYSIS: NORMAL AND PATHOLOGICAL FUNCTION (1992).

the movement of a healthy ankle" is not indefinite.

## 2.    Claim Construction

Össur contends that the term "substantially mimicking the movement of a healthy ankle" can be readily understood according to its ordinary meaning and need not be given special construction by the Court.  Because iWalk contends that the term is indefinite, it also proposes no specific construction of the term, but does request that the Court's construction exclude a device that uses a stop mechanism limiting the range of movement.

As noted, the Court is not required to provide additional language construing a claim if its ordinary meaning can be readily understood by a layperson and adopting it would resolve the parties' dispute concerning interpretation.  *See O2 Micro*, 521 F.3d at 1361; *see also CardioFocus, Inc. v. Cardiogenesis Corp.*, 827 F. Supp. 2d 36, 41 (D. Mass. 2011) (holding that when "claim terms do not implicate any special knowledge possessed by a person in the art and, thus, should be given their ordinary meanings," and the terms are not "ambiguous or uncommon," claim construction is not warranted); *Finjan*, 626 F.3d at 1206-07 (holding that the district court did not err by not explicitly construing the term "addressed to a client" and relying on its ordinary meaning); *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Here, it is not clear that the parties actually dispute the interpretation of the term "substantially mimicking the movement of a healthy ankle."  To the extent that there is a dispute, it seems to concern whether a device that utilizes a stop mechanism to restrict its movement can "substantially mimic" a healthy ankle.  However, to resolve this dispute would essentially

require the Court to make a summary judgment decision as to non-infringement, without

significant briefing on the issue.   Accordingly, the Court will refrain from formally construing

the term.

Nonetheless, the Court is concerned that lay jurors' general understanding of the term,

without further interpretation by the Court, might differ from the meaning given to it by those

skilled in the art.  *Accord Phillips*, 415 F.3d at 1315-1317.  This is of particular concern due to

the use of the modifier "substantially."  Accordingly, though the Court will not formally construe

the term, it will direct the parties to rely on Perry's graphical depiction of healthy ankle

movement, adorned with lines of standard deviation, when presenting evidence as to whether

iWalk's device  "substantially mimic[s] the movement of a healthy ankle."

E.        **"Subsequent Gait Cycles"**

The term "subsequent gait cycles" appears in claim 1 of the '737 patent.  The relevant

part of the claim reads as follows:

> . . . said ankle-angle adjustments being applied over a swing phase of **subsequent gait cycles** until a state transition is detected from the determined gait pattern or event to a different gait pattern or event.

'737 Patent at col. 20 ll. 53-57 (emphasis added).

The parties' dispute about the construction of this term concerns only whether the Court

should define the word "subsequent" and, if so, how.[4]   Össur contends that the entire term need

not be construed, but if the meaning of the word "subsequent" must be clarified, the Court

should define it as "later."  iWalk contends that the Court must construe the word "subsequent"

to mean "after at least one gait cycle" in order to firmly establish that the ankle-angle

---

[4] The parties have agreed to a construction of the included term "gait cycle."

adjustments described in claim 1 do not occur during the first gait cycle.

The plain language of the claim itself lends some support to iWalk's proposed construction, but is ultimately not clear enough to override the other intrinsic evidence. Claim 1 teaches a "method for controlling an ankle device" that comprises a number of steps. The first of those steps involves "monitoring, with at least one sensor, at least one of position and movement of an ankle device associated with a limb *throughout at least one gait cycle*." '737 Patent at col. 20 ll. 34-36 (emphasis added). The second step involves "generating data indicative of the at least one of position and movement *throughout the at least* [sic] *one gait cycle*." *Id.* at col. 20 ll. 39-40 (emphasis added). The final step of the method includes the term at issue and teaches making ankle-angle adjustments and continuing to apply them "over a swing phase of *subsequent gait cycles* until a state transition is detected from the determined gait pattern or event to a different gait pattern or event." *Id.* at col 20 ll. 54-57 (emphasis added).

iWalk contends that the claim's progression through these steps indicates that the "subsequent gait cycles" are gait cycles after the "at least [sic] one gait cycle" in which the monitoring and data generation occurred. However, iWalk assumes a specific internal reference that is not obvious, and thereby reads too much into the limitation of the final step and misinterprets its purpose. Properly read, the final step, in which the ankle-angle adjustments are to be "applied over a swing phase of subsequent gait cycles," is meant to emphasize not when the ankle-angle adjustments are first applied, but rather the duration over which those adjustments are continually applied. That is made evident not only by the language defining that duration—"until a state transition is detected from the determined gait pattern or event to a different gait pattern or event"—but also by the language of the earlier part of the step that

actively describes "adjusting the device based on the determined ankle-angle adjustments corresponding to the determined gait pattern or event." *Id.* at col. 20 ll. 55-57, 48-50. Furthermore, considering the repeated use of the phrase "at least one gait cycle," it seems likely that if the patentee intended to limit the claim to devices that do not make adjustments during the first gait cycle, it would have specifically made reference to it using that same language.

Össur, in turn, points to the specification of the '737 patent, which states that "[i]n one embodiment of the invention, the control system detects the gait of the user and adjusts the ankle device accordingly while the ankle device is in a swing phase of the first step." *Id.* at col. 12 ll. 53-56.  It goes on to describe other embodiments where "there may be a latency period in which the control system requires one or two strides before being able to accurately determine the gait of the user and to adjust the ankle device appropriately." *Id.* at col. 12 ll. 57-60.  Össur invokes the principle that "[a] claim construction that excludes the preferred embodiment is rarely, if ever, correct" to suggest that Court must not construe the word "subsequent" so as to exclude adjustments made in the first gait cycle. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010).

As noted, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips* at 1316 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  Here, construing the word "subsequent" to mean "later," but not confining the term "subsequent gait cycles" to "gait cycles after the at least [sic] one gait cycle," conforms with the language of the claim and does not exclude the embodiments disclosed in the specification.  Furthermore, such a construction will not create an internal reference within claim

1 that could potentially confuse the jury.

Accordingly, the Court will construe the term "subsequent gait cycles" to mean "later gait cycles."

**F.**     **"Corresponding to [a / the] Determined Gait Pattern or Event"**

The term "corresponding to [a/the] determined gait pattern or event" appears in various iterations throughout claim 1 of the '737 patent.  The pertinent part of claim 1 reads as follows:

> . . . processing the data with a processing module to determine if the data **corresponds to one of a plurality of defined gait patterns or events**, wherein information defining said plurality of gait patterns or events is stored in a memory of the device; determining ankle-angle adjustments **corresponding to a determined gait pattern or event**; and adjusting the device based on the determined ankle-angle adjustments **corresponding to the determined gait pattern or event** . . .

'737 Patent at col. 20 ll. 41-47 (emphasis added).

The included term "gait pattern or event" has already been construed.  The only further dispute as to this term concerns whether the Court should define the word "determined" and, if so, how.  Össur contends that the term need not be construed, and the Court should simply adopt its plain meaning.  iWalk contends that the Court must construe the term in order to firmly establish that the "gait pattern or event" is "determined" based on the data acquired by, and stored in, the device.

As support for its proposed construction, iWalk again refers to the steps disclosed in claim 1.  As recited above, the first two of those steps involve "monitoring . . . [the] position and movement of an ankle device . . . and generating data" based on that monitoring.  '737 Patent at col. 20 ll. 34-36, 39-40.  The next step teaches "processing the data with a processing module to determine if the data corresponds to one of a plurality of defined gait patterns or events."  *Id.* at 41-43.  iWalk thus asks the Court to construe the term "corresponding to [a/the] determined gait

pattern or event" to mean "corresponding to the gait pattern or event determination made with the data" in order to make clear to the jury that any time a step of claim 1 mentions a "determined" gait pattern or event it refers to a gait pattern or event determination made via the "processing" step just described.

Össur responds first by stressing the argument that the words "corresponding" and "determined" are easily understood by a lay jury and thus need no further construction.  Össur goes on to contend that iWalk's proposed construction is not only unnecessary, but also improperly rewrites the claim to import an extrinsic limitation.

Again, the court may not import limitations into the claims that have no basis in the language of the claims themselves, whether those limitations come from the specification or from some other extrinsic source.  *See Phillips*, 415 F.3d at 1323 (holding that courts must not "import[] limitations from the specification into the claim"); *see also DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) (reversing claim construction where a district court "improperly read into [the claims] a new limitation not required by the claim language"). However, the Court finds that adopting iWalk's proposed construction of the term at issue would not violate that principle.  iWalk's proposed construction is based on the language of the claim itself and the progression of disclosed method steps within the claim.  The internal reference between the "determined" gait pattern or event and the earlier description of how it is determined has a strong basis in the language of the claim.  There is no other description, in the claim or in the specification, of how a gait pattern or event might be "determined" other than by processing the data acquired by the device.  Adopting iWalk's proposed construction of this term would not exclude any of the embodiments disclosed in the specification.  The Court also agrees with

iWalk that a lay juror may not recognize that the phrase "determined gait pattern or event" as used in later steps of claim 1 is meant to refer back to the earlier steps of claim1 that teach how such a determination is made.

Accordingly, the Court will construe the term "corresponding to [a/the] determined gait pattern or event" to mean "corresponding to [a/the] gait pattern or event determination made with the data."

### G.        "Position" and "Movement"

The terms "position" and "movement" appear in claim 1 of the '737 patent and claims 1, 5, and 7 of the '927 patent.  Their general use in claim 1 of the '737 patent encompasses the more specific references in the later claims:

> . . . monitoring, with at least one sensor, at least one of **position** and **movement** of an ankle device associated with a limb throughout at least one gait cycle, wherein the device comprises a foot unit, a lower limb member, and at least one actuator . . .

'737 Patent at col. 20 ll. 34-38 (emphasis added).

Össur contends that the terms "position" and "movement" can be readily understood according to their ordinary meanings and need not be given special construction by the Court. iWalk contends that the terms have specific meanings in the context of the invention that must be explained to the jury to avoid potential confusion.  iWalk proposes that the Court construe the term "position" to mean "location relative to the ground," and the term "movement" to mean "change of position in time."

A court is not required to provide additional language construing a claim if its ordinary meaning can be readily understood by a layperson and adopting it would resolve the parties' dispute concerning interpretation.  *See O2 Micro*, 521 F.3d at 1361; *see also CardioFocus, Inc.*

*v. Cardiogenesis Corp.*, 827 F. Supp. 2d 36, 41 (D. Mass. 2011) (holding that when "claim terms do not implicate any special knowledge possessed by a person in the art and, thus, should be given their ordinary meanings," and the terms are not "ambiguous or uncommon," claim construction is not warranted); *Finjan*, 626 F.3d at 1206-07 (holding that the district court did not err by not explicitly construing the term "addressed to a client" and relying on its ordinary meaning); *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Although the terms "position" and "movement" are not complicated, they can describe a great variety of spatial relationships and actions. iWalk's construction attempts to confine the terms to descriptors of the ankle device as a whole, not of any constituent part. As support for its limiting construction of "position," iWalk cites the specification of the '737 patent, which describes the information that the sensor module may collect including "the position of the ankle device with respect to the ground." '737 Patent at col. 12 ll. 18-20. iWalk contends that the quoted specification language is the only description of "position" in the patent. As support for its limiting construction of "movement," iWalk cites only the American Heritage College Dictionary, which defines "movement" as, among other things, "a change in place or position."

Again, a court must not import limitations into the claims that have no basis in the language of the claims themselves, whether those limitations come from the specification or from some other extrinsic source. *See Phillips*, 415 F.3d at 1323 (holding that courts must not "import[] limitations from the specification into the claim"). Furthermore, the Federal Circuit in

*Phillips* strongly cautioned against the approach of importing limitations from dictionary definitions into claim construction.  415 F.3d at 1321.  iWalk provides no compelling reason why the terms "position" and "movement" should be defined as narrowly as it contends.  There is also no evidence that lay jurors would be confused by the terms or have a different understanding than those skilled in the art.  *See Phillips*, 415 F.3d at 1315-1317.

Accordingly, the Court will not construe the terms "position" and "movement" beyond attributing to them their ordinary meanings.

**H.**      **"State Transition Is Detected from the Determined Gait Pattern or Event to a Different Gait Pattern or Event"**

The term "state transition is detected from the determined gait pattern or event to a different gait pattern or event" appears in claim 1 of the '737 patent.  The relevant part of the claim reads as follows:

> . . . said ankle-angle adjustments being applied over a swing phase of subsequent gait cycles until a **state transition is detected from the determined gait pattern or event to a different gait pattern or event**.

'737 Patent at col. 20 ll. 53-57 (emphasis added).

The parties appear to agree that the included term "state transition" simply means "change."  Indeed, they appear to generally agree that the entire term at issue describes a change from one gait pattern or event to another.  The dispute between the parties concerns the included term "different" and whether the claim requires that the new gait pattern or event be "determined" according to the method described in the other parts of claim 1.  iWalk contends that it must be so "determined," and thus proposes to construe the term "different" to mean "another determined."   iWalk then proposes to construe the entire term at issue to mean "change is detected from one determined gait pattern or event to another determined gait pattern or

36

event."  Össur contends that iWalk's proposed construction impermissibly narrows the claim, and instead proposes to construe the term "different" to mean "second defined."  Össur then proposes to construe the entire term at issue to mean "change from a first defined gait pattern or event to a second defined gait pattern or event."  Upon careful examination of the intrinsic evidence, the Court is not convinced that either of the proposed constructions is entirely appropriate.

iWalk contends that the claim language, the specification, and the file history teach no other way to detect a "different gait pattern or event" other than to "determine" it by carrying out the steps of claim 1.  As a result, iWalk urges the Court to make clear to the jury that the claim requires the device to make a second determination in order to engage in a state transition.  However, Össur responds that the claim language includes no such requirement, and thus importing it during claim construction would be improper.

Claim 1 of the '737 patent uses both the phrase "determined gait pattern or event" and the phrase "different gait pattern or event."  It uses those phrases in different contexts, to describe different steps in the method.  For example, the claim teaches the step of "determining ankle-angle adjustments corresponding to a *determined gait pattern or event*."  This step thus requires the device to "determine" a *specific* gait pattern or event and adjust the ankle-angle according to that determination.  In contrast, the claim employs the term "different gait pattern or event" when it describes the duration over which ankle-angle adjustments are continually applied, indicating that those adjustments are no longer applied when a change is "detected from the determined gait pattern or event to a *different gait pattern or event*."  This suggests that the adjustments cease to be applied when the gait pattern or event is detected to be generally

different, not when a specific new gait pattern or event is detected.  Not coincidentally, iWalk

cites no other intrinsic or extrinsic evidence to support its proposed construction, which would

require that a specific determination be made.  Finally, it is clear from the prolific use of the

word "determined" throughout claim 1 that if the drafter wanted to require that a new,

"different" gait pattern or event be specifically "determined," he could have used that

descriptor.[5]  Accordingly, the Court will not adopt iWalk's proposed construction.

　　　　Unfortunately, Össur also attempts to rewrite the claim with its proposed construction.

Specifically, Össur replaces both the included terms "determined" and "different" with the word

"defined."  As support for this construction, Össur cites to the prosecution history.  However,

none of the language cited by Össur uses the word "defined" to describe a "gait pattern or

event."  Although it might not impermissibly expand the claim's scope, the use of "defined" here

in construing the term has the potential to confuse the jury.  Furthermore, the word "different" is

readily understood by lay persons and has no special meaning in this context.  Accordingly, the

Court will not adopt Össur's proposed construction.

　　　　Although neither party specifically requested such an interpretation, the ordinary

meaning of the included term "different" can be readily understood by a layperson.  *See*

*CardioFocus, Inc. v. Cardiogenesis Corp.*, 827 F. Supp. 2d 36, 41 (D. Mass. 2011) (holding that

when "claim terms do not implicate any special knowledge possessed by a person in the art and,

thus, should be given their ordinary meanings," and the terms are not "ambiguous or

uncommon," claim construction is not warranted).  The word "different" does not imply that the

---

[5] As Össur correctly points out, there is a presumption in claim construction that different words used in the claims of the same patent are presumed to have different meanings.  *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

gait pattern or event be "determined," as iWalk would prefer.  Using the ordinary meaning

conforms to the claim language and Össur's proposed construction, without adding the potential

for juror confusion.  The Court will thus adopt the agreed-upon construction of "state transition"

to mean "change," but will not otherwise construe the remainder of the term.

Accordingly, the Court will construe the term "state transition is detected from the

determined gait pattern or event to a different gait pattern or event" to mean "change is detected

from the determined gait pattern or event to a different gait pattern or event."

### I.      "Relaxed Position"

The term "relaxed position" appears in claim 1 and dependent claim 7 of the '927 patent.

The term's use in the following portion of claim 1 is typical:

> . . . adjusting the prosthetic ankle device based on whether the user is in the **relaxed position**, wherein adjusting the prosthetic ankle device comprises automatically adjusting a configurable element of the prosthetic ankle device.

'927 Patent at col. 40 ll. 1-5 (emphasis added).

The parties' dispute concerns whether the term "relaxed position" refers specifically and

exclusively to a sitting position, or whether it encompasses other "non-walking postures."  iWalk

contends that the language of claim 1 limits the term to mean only a "sitting position."  Össur

contends that the term is not so narrowly defined, and further contends that it can be readily

understood according to its ordinary meaning and need not be given special construction.  In the

alternative, Össur proposes that the term be construed to mean "non-walking posture (such as

sitting, crossing legs, reclining, lying down, crawling, leaning, etc.)."

iWalk finds strong support for its proposed construction in the language of claim 1 of the

'927 patent.  Claim 1 specifically describes "processing the data with a processing module to

determine whether the user is in a relaxed position, wherein *the relaxed position is a sitting position*." '927 Patent at col. 39 ll. 65-67 (emphasis added).  As *Phillips* indicated, the words of the claims themselves are of paramount importance to the construction of terms included within them.  415 F.3d at 1314.  *Philips* further held that when "the specification . . . reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess . . . the inventor's lexicography governs."  *Id.* at 1316.  That rule applies with equal, if not greater, force to definitions included within the claims themselves.

In response, Össur points to the specification of the '927 patent, which describes a number of "relaxed position[s], such as sitting, crossing legs, reclining, lying down, crawling, leaning, etc." '927 Patent at col. 34 ll. 20-23.  Össur contends that to confine the term to refer only to "sitting" would impermissibly add a new limitation to the claim.   Össur further contends that iWalk's construction is improper because it would render "relaxed" mere surplusage in claim 1 by giving it the same meaning as "sitting."  *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting a proposed construction that would render a phrase as "mere surplusage").

The language of claim 1 and the patent prosecution history suggests that iWalk's interpretation is in fact correct.  Claim 1 refers to "processing the data with a processing module to determine whether the user is in *a* relaxed position, wherein *the* relaxed position is a sitting position; and adjusting the prosthetic ankle device based on whether the user is in *the* relaxed position . . . " '927 Patent at col. 39 ll. 65-67, col. 40 ll. 1-2 (emphasis added).  As that passage indicates, the claim uses both the indefinite article "a" and the definite article "the" before the term "relaxed position."  The "wherein" conjunction followed by the definite article suggests

that "the relaxed position" refers to a specific "relaxed position," which is defined as "a sitting

position."  *See Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("it

is a rule of law well established that the definite article 'the' particularizes the subject which it

precedes"); *see also Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1354 (Fed. Cir.

2010) (finding that a "wherein clause" expressly excluded some potential embodiments of the

claim).  The fact that "the relaxed position" in claim 1 is defined as a "sitting position" does not

foreclose the possibility that other "relaxed positions" exist and are indeed described in the

specification.

   The patent prosecution history further supports iWalk's position that "the relaxed

position," as it is used in claim 1, refers specifically to a "sitting position."  When originally

filed, claim 1 of the '927 patent recited "processing . . . to determine whether the user is in a

relaxed position" and "adjusting . . . based on whether the user is in a relaxed position."  The

PTO concluded that the unmodified phrase "a relaxed position" covered a variety of positions,

including standing, and therefore found it obvious in light of the prior art.  The PTO then advised

that dependent claim 27, which recited "[t]he method of claim [1], wherein the relaxed position

is a sitting position," would be allowable if "rewritten in independent form."  The inventors

responded by amending claim 1 to incorporate claim 27 by adding the phrase "wherein the

relaxed position is a sitting position" and changing "a relaxed position" to "the relaxed position"

in the preceding clause.  The Federal Circuit has found such use of "wherein" clauses in

amendments to be instructive in claim construction.  *See, e.g., Fantasy Sports Props., Inc. v.

Sportsline.com, Inc.*, 287 F.3d 1108, 1111–16 (Fed. Cir. 2002) (finding that "wherein" clause

added to overcome prior art limited the construction of the term "bonus points" so as to exclude

41

the kind of "bonus points" described in the prior art).  The Court will give the "wherein" clause

of claim 1 similar import.

Accordingly, the Court will construe the term "the relaxed position" to mean "a sitting

position."[6]

### J.   "Configurable Element"

The term "configurable element" appears in claim 1 and dependent claim 11 of the '927

patent.  The term's use in claim 1 encompasses the more specific references in the later claims:

> . . . adjusting the prosthetic ankle device based on whether the user is in the relaxed
> position, wherein adjusting the prosthetic ankle device comprises automatically adjusting
> a **configurable element** of the prosthetic ankle device.

'927 Patent at col. 40 ll. 1-5 (emphasis added).

### 1.   Indefiniteness

Rather than propose a construction for the term "configurable element," iWalk contends

that the term is indefinite, and it therefore renders claims 1 and 11 of the '927 patent invalid.

Again, in order to be valid, a patent claim must be sufficiently definite that "one skilled in the art

would understand the bounds of the claim when read in light of the specification."  *Exxon*

*Research*, 265 F.3d at 1375.  Indefiniteness must be proved by clear and convincing evidence.

*Halliburton*, 514 F.3d at 1249.

iWalk contends that the term "configurable element" is indefinite because it cannot be

construed in such a way that it encompasses all of the "configurable elements" disclosed in the

claims of the '927 patent and still conforms with the use of the included term "element" in the

---

[6] The Court expressly does not construe the term "*a* relaxed position" to refer only to sitting.  The Court
agrees with Össur that a number of "relaxed positions" are disclosed in the specification of the '927 patent—such as
reclining, lying down, and leaning—but finds that the definite article preceding "relaxed position" as it is used in
claim 1 and dependent claim 7 indicates that the term refers to a specific "relaxed position," namely sitting.

patent specification.  Claims 9 and 11 of the '927 patent disclose specific examples of "configurable elements"—"the angle between the prosthetic foot and the limb member" and "the amount of operating power."   '927 Patent at col. 40 ll. 64-65, col. 42 ll. 6-7.  Because claim terms are normally used consistently throughout the patent, any construction of "configurable element" must encompass both of these uses of the term.   *Phillips*, 415 F.3d at 1314; *Acromed.*, 253 F.3d at 1382.  iWalk concedes that Össur's proposed construction—"parameter"—would do so, but nonetheless takes issue with it because that construction is allegedly inconsistent with the ordinary meaning of "element" and its use in the '927 patent specification.

As support for its construction, iWalk cites to the American Heritage College Dictionary, which defines "element" as, among other things, "a fundamental, essential, or irreducible constituent of a composite entity."  iWalk then cites to examples of "elements" of the device that are numbered in the drawings and described in the text of the '927 patent specification, suggesting that they conform to this definition.  Those examples include:  "the prosthetic ankle joint," "the sensor module," and "the power module."  '927 Patent at col. 6 ll. 1, col. 34 ll. 20, co. 36 ll. 63.[7]  iWalk contends that there is no reasonable construction of the term "configurable element" that encompasses these physical components of the device and the settings described in claims 9 and 11.

iWalk's argument is flawed for multiple reasons.  First, and most importantly, iWalk has set up a false requirement.  Although it is well-established that a claim term must be interpreted consistently throughout a patent, the specific term at issue—"configurable element"— is found

---

[7] iWalk also contends that the specification describes the "heel" of the device as an element.  However, the specification actually describes "heel height," which, not coincidentally, conforms with Össur's proposed "parameter" construction.

nowhere in the passages of the specification on which iWalk rests its indefiniteness contention. Indeed, the included, but different, term "element" is found only in the part of the specification that describes the numbering of the drawings; no specific examples are listed and it is not expressly defined. The Court is therefore not required to construe "configurable element" such that it has the same meaning as "element," or even that it covers all of the purported examples of "elements" in the specification. Second, even if such a requirement existed, the fact that Össur's proposed construction may not encompass all the examples of "elements," even if proved, is not clear and convincing evidence that no construction of the term whatsoever could encompass them. Third, iWalk's argument relies heavily on the incompatibility of Össur's proposed definition of "configurable element" with the dictionary definition of "element." Again, the Federal Circuit has strongly cautioned against the approach of importing limitations from dictionary definitions into claim construction. *Phillips*, 415 F.3d at 1321.

Finally, attorney argument, without more, is generally not considered clear and convincing evidence sufficient to overcome the presumption of validity. *See, e.g., WesternGeco LLC,* 876 F. Supp. 2d at 875; *Cacace*, 812 F. Supp. 2d at 559-60. Here, it was not iWalk—the party with the burden of proof as to indefiniteness—but Össur that put forth expert testimony on the meaning of this term. Dr. Gard offered the opinion that "a person of ordinary skill in the art, having read the '927 patent, including its specification and claims, would have readily understood what the term 'configurable element' means and would not have found that term ambiguous." (Gard Dec. at ¶ 41). iWalk offered no competing expert testimony as evidence of indefiniteness. Instead, they relied on the arguments recited above and on their cross-examination of Dr. Gard.

iWalk has not met its burden of proving the term "configurable element" to be indefinite. Indeed, the record evidence suggests that a person of ordinary skill in the art would, in fact, be able to understand the term.  Accordingly, the Court finds that the term "configurable element" is not indefinite.

### 2.   Claim Construction

As noted, Össur proposes to define the term "configurable element" as "parameter." iWalk concedes that this definition would fairly encompass the use of the term in claims 9 and 11 of the '927 patent, which disclose examples of "configurable elements."  Furthermore, Össur's expert, Dr. Gard, testified that construing "configurable element" to mean "parameter" would be "perfectly reasonable and understandable to a person of ordinary skill in the art." (Gard Dec. at ¶ 41).  Therefore, there is no reason why Össur's proposed construction should not be adopted; it adequately defines the term based on its usage in the claims themselves and conforms with the understanding of those skilled in the art.

Accordingly, the Court will construe the term "configurable element" to mean "parameter."

### K.   "Automatically Adjusting"

The term "automatically adjusting" appears in claim 1 of the '927 patent.  The relevant part of the claim reads as follows:

> . . . adjusting the prosthetic ankle device based on whether the user is in the relaxed position, wherein adjusting the prosthetic ankle device comprises **automatically adjusting** a configurable element of the prosthetic ankle device.

'927 Patent at col. 40 ll. 1-5 (emphasis added).

The parties appear to agree that the included term "adjusting" can be readily understood

according to its ordinary meaning and need not be given special construction.  Össur, however,

contends that the term "automatically adjusting" refers to a very specific type of adjusting,

involving a change "from one state to another, based on the processed data."  iWalk contends

that the included term "automatically" should also simply be given its ordinary meaning, and

therefore, the whole term need not be construed.

As noted, the Court is not required to provide additional language construing a claim if

its ordinary meaning can be readily understood by a layperson and adopting it would resolve the

parties' dispute concerning interpretation.  *See O2 Micro*, 521 F.3d at 1361.

Here, adopting the ordinary meaning of the term "automatically adjusting" would settle

the interpretation dispute, because Össur's proposed construction attempts to limit the term's

scope to a subset of automatic adjustments—namely, changes in device states.  As support for its

limiting construction of "automatically adjusting" Össur cites the specification of the '927 patent

where it describes "a controller configured to automatically adjust the state of the prosthetic

ankle joint," as well as other instances of automatic adjustments to various states, including

"RELAX" and "EXIT."  *See* '927 Patent at col. 5 ll. 67 - col. 6:4, col. 13 ll. 59-60, col. 36 ll. 60-

62, col. 36 l. 66.  Again, however, a court must not "import[] limitations from the specification

into the claim."  *Phillips*, 415 F.3d at 1323.  The portions of the specification cited by Össur all

describe what is to be "automatically adjusted" in different scenarios.  None of them indicate that

the term "automatically adjusting" somehow incorporates all of the descriptions in the

specification about specific automatic adjustments to the states of various components.  *See*

*Lucky Litter LLC v. ITC*, 403 Fed. Appx. 490, 494 (Fed. Cir. 2010) (holding that "the words of a

claim are generally given their ordinary and customary meaning, absent a clear indication

otherwise from the specification or prosecution history, as where the patentee acts as his own lexicographer or clearly disavows claim scope"). Without some evidence from the claim itself that the term is so limited, the Court will not adopt a narrowing construction of an otherwise easily understood claim term.

Össur further contends that in drafting the patent, it assigned a special meaning to the term "automatically adjusting" that is evidenced by the cited portions of the specification. Claim 1 itself, particularly as construed herein, provides no support for this position. The claim generally describes "automatically adjusting a configurable element." Construing the term "configurable element" to mean "parameter," claim 1 of the '927 patent indicates that an adjustment is made to a parameter automatically. However, it is unclear how the "state" of a parameter could be adjusted, which is what Össur's proposed construction of the term would require. Accordingly, the Court finds that Össur's proposed construction lacks support in the claim language, and therefore will not adopt it.

As support for its contention that term "automatically adjusting" need not be formally construed, iWalk refers to the ordinary meaning of the term "automatically" and cites to the specification of the '927 patent. The specification describes an embodiment wherein "the prosthesis may automatically adjust the heel height without the need for user input." '927 Patent at col. 13 ll. 59-60. iWalk contends that the ordinary meaning of "automatic" is "without user input," citing *Personalized User Model LLP v. Google Inc.*, 2012 WL 295048, *29 (D. Del. Jan. 25, 2012), wherein the Court construed the term, as the parties had agreed, to mean "without human intervention." That understanding is consistent with two of the standard dictionary definitions of "automatic"—"done or produced as if by machine" and "having a self-acting or

self-regulating mechanism."  Giving the term "automatically adjusting" its ordinary meaning, then, conforms to the specification, which describes adjustments being made "without the need for user input."  Furthermore, there is no evidence that those skilled in the art would understand the term differently from its ordinary use in the specification.  *See Phillips*, 415 F.3d at 1315-1317.

Accordingly, the Court will not construe the term "automatically adjusting" beyond attributing to it its ordinary meaning.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the disputed claim terms are construed as follows:

1. the terms "substantially mimic[s] the movement of a healthy ankle,"  "position,"  "movement," and "automatically adjusting" have their ordinary meaning and need not be given special construction by the Court;

2. the term "gait pattern(s) or event(s)" means "detectable series of normal ankle movements during locomotion or normal ankle functions during nonlocomotion";

3. the term "ankle-angle adjustments" means "a change, or multiple changes, to the angle between the foot unit and the lower limb member";

4. the term "processing module" means a "computer-like component, or CPU, of the ankle device";

5. the term "subsequent gait cycles" means "later gait cycles";

6. the term "corresponding to [a/the] determined gait pattern or event" means "corresponding to [a/the] gait pattern or event determination made with the data";

7. the term "state transition is detected from the determined gait pattern or event to a

different gait pattern or event" means "change is detected from the determined

gait pattern or event to a different gait pattern or event";

8.      the term "the relaxed position" means "a sitting position"; and

9.      the term "configurable element" means "parameter."

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:   August 8, 2013